Coro, Inc. *v.* United States (No. 4785) [1]

---

[1] C. A. D. 554.

United States Court of Customs and Patent Appeals, March 23, 1954

*John D. Rode* for appellant.

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *Mollie Strum*, special attorneys, of counsel), for the United States.

[Oral argument February 3, 1954, by Mr. Rode and Mr. FitzGibbon]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, entered pursuant to its decision C. D. 1524. There it was held that certain merchandise imported from Mexico by appellant and described on the invoice as "silver Pins corazon" to be properly classified and assessed with duty at 80 per centum ad valorem by the Collector of Customs at the port of New York as metal stampings, under paragraph 1527 (d) of the Tariff Act of 1930, which reads as follows:

(d) Stampings, galleries, mesh, and other materials of metal, whether or not set with glass or paste, finished or partly finished, separate or in strips or sheets, suitable for use in the manufacture of any of the foregoing articles in this paragraph, if of gold or platinum, 75 per centum ad valorem: if of other metal or metals, plated or unplated, 80 per centum ad valorem.

Appellant, an importer, manufacturer, and seller of costume jewelry for more than fifty years, protested the classification hereinbefore described and at the trial vigorously asserted the claim that the merchandise is dutiable at rates equivalent to 55 per centum ad valorem as unfinished jewelry under the provisions of said paragraph 1527 (a) (2), as modified by the trade agreement with Mexico, T. D. 50797, reading as follows:

Jewelry, commonly or commercially so known, finished or unfinished (including parts thereof), of whatever material composed (except jewelry composed wholly or in chief value of gold or platinum, or of which the metal part is wholly or in chief value of gold or platinum):

Valued above 20 cents but not above $5 per dozen pieces * * *

More specifically, the merchandise in issue consisted of 4,943 rough, dull or unpolished heart-shaped pieces of silver stamped from a larger piece of metal by a power press with the use of dies which formed the imported hearts into three different sizes, respectively identified as plaintiff's Exhibit 1, an official sample of the unfinished merchandise,

and plaintiff's illustrative Exhibits 2 and 3. The Customs Court in its decision added these supplemental observations:

A sample (plaintiff's exhibit 1) is representative of all of the items in question, except as to size. The article is the smallest of the three sizes that were imported. It is shaped like a half heart so that if laid on a flat surface the upper part would be raised above the surface as though a silver heart were split down the side. It measures about 1 inch overall, and seven-eighths of an inch at its widest part.

\* \* \* \* \* \* \*

\* \* \* All of the merchandise under consideration was finished by plaintiff into either earrings or brooches, articles of personal adornment worn by women. To make a heart earring from the metal piece (exhibit), the back thereof is fitted with an earring wire, consisting of a plunger with a knob and button at the end (plaintiff's illustrative exhibit 2). The larger imported items (approximately 1½ inches overall and 2 inches at the widest point) are material for the manufacture of brooches, which, in their completed condition, are fitted with a bar pin and a safety catch (illustrative exhibit 3). Both of the finished articles, the earring and the brooch, are polished or plated, giving them a high luster, and each of them is sold by plaintiff as jewelry.

The Customs Court in reaching its conclusion voluntarily inserted the following consideration early in its decision:

To clarify the foregoing assessment, it should be mentioned that paragraph 1527 provides for a myriad of articles, including those set forth in subdivision (c) thereof, as follows:

(c) Articles valued above 20 cents per dozen pieces, designed to be worn on apparel or carried on or about or attached to the person, such as and including buckles, cardcases, chains, cigar cases, cigar cutters, cigar holders, cigar lighters, cigarette cases, cigarette holders, coin holders, collar, cuff, and dress buttons, combs, match boxes, mesh bags and purses, millinery, military and hair ornaments, pins, powder cases, stamp cases, vanity cases, watch bracelets, and like articles; all the foregoing and parts thereof, finished or unfinished: \* \* \*

The primary question presented by the pleadings and litigated in the court below involved the issue of whether these pieces of silver are unfinished articles of jewelry, suitable in their imported condition for no other commercial use; or merely pieces of silver material susceptible for use in the manufacture and sale of numerous articles of merchandise otherwise enumerated in paragraph 1527. On that issue, counsel for the Government contend here that appellant, the importer, has not overcome the presumption of correctness of the collector's classification of the imported items as stampings under subdivision (d) of paragraph 1527.

The importer in matters of classification is under a two-fold burden in that he must prove not only that the Government's classification is erroneous but also that his own claimed classification is the proper one. *Davies, Turner & Co.* v. *United States,* 40 C. C. P. A. (Customs) 193, C. A. D. 517. The Customs Court in its decision below properly noted that the provision for "Stampings \* \* \* of metal" in para-

graph 1527 (d), adopted by the collector, contemplates manufacturing *materials* susceptible of use in the production of a wide variety of articles embraced within paragraph 1527 of the Tariff Act of 1930; and that the provision for unfinished jewelry, under which plaintiff seeks classification, is applicable to such articles as have been so far processed that they are definitely committed to a particular article or class of articles of jewlery and are not commercially suitable for any other use, citing *United States* v. *Cartier, Inc.*, 15 Ct. Cust. Appls. 334, T. D. 42493; *United States* v. *Cohn & Rosenberger, Inc.*, 19 C. C. P. A. (Customs) 137, T. D. 45259. In the tariff law the term "suitable" as here used means actually, practically, and commercially fit. *Kahlen* v. *United States*, 2 Ct. Cust. Appls. 206, 208, T. D. 31947.

The importer introduced the testimony of Mr. Pincus Jacobs, foreign buyer of raw materials, stones, etc., during the past 21 years for the appellant corporation, Coro, Inc. The Government introduced the testimony of Mr. Edgar Roedelheimer, president of Accessocraft Products Corporation. Both corporations have their respective places of business in New York City and import, manufacture, and sell costume jewelry. A sample of the merchandise was also considered by the court as a potent witness in connection with the testimony submitted by the parties. *United States* v. *Marshall Field & Co.*, 19 C. C. P. A. (Customs) 331, 333, T. D. 45483; *United States* v. *Bernard, Judae & Co.*, 18 C. C. P. A. (Customs) 68, T. D. 44029.

There is no dispute that the design of the imported articles was made or shaped by a stamping machine; that such articles are unfinished products; that in the finishing process such articles require polishing and the addition of a bar pin and a safety catch, in the case of a brooch, or an earring wire in the case of an earring, to fit them for suitable use as jewelry; and that the additional attachments with which the finished pieces of jewelry are thus fitted are known in the trade as "findings," which are purchased at a finding house.

Appellant's witness Jacobs testified that in their finished condition the earrings were worn on a woman's ear; the brooch about the person, on a hat, dress or skirt; that the finished articles were sold throughout the United States by appellant as jewelry; and that an inspection of any of the imported articles would definitely indicate its dedication to a completed article of jewelry:

By Mr. Rode:

Q. Can you tell, based upon your experience in the jewelry trade, and your familiarity with manufacturing operations, can you look at Exhibit 1 and know what it is from its appearance? A. Yes.

Q. What is Exhibit 1? A. It is the beginning of a brooch or an earring.

Q. In other words, you can tell from an inspection of it, by its size or shape, what it is? A. That is true.

Q. And you recognize it as an unfinished brooch or earring? A. That is right.

Q. Would you say that articles in the condition of Exhibit 1 are dedicated to that use to be finished into an earring or a brooch?   A. Yes.

The difficulty in sustaining appellant's position that the imported items are unsuitable for other commercial use resides in the incompatible testimony given by the witness Jacobs in reply to the following questions put to him by appellant's counsel and by the members of the court:

By Mr. Rode:

Q. What do you recognize Illustrative Exhibits 2 and 3 as?   A. Pieces of jewelry, unfinished jewelry.

Q. Referring back to Exhibit 1, which is the merchandise in the condition as imported, were those items suitable for use in any other fashion than you have described?   A. It is possible.

Q. As a commercial matter, you have testified that all of the imported articles were made by Coro into either brooches or earrings.   None of them were used for any other purpose?   A. No.

Q. Were they commercially fit for any other purpose?   A. Yes, they are commercially fit for other purposes.

Q. What other purposes?   A. Offhand I wouldn't know, but I believe they would be suitable for other purposes.

Q. Would those other purposes be for making jewelry?   A. No, not for making jewelry.

Chief Judge Oliver: Did you ever use them for any other purpose?
The Witness: No.
Judge Mollison: Have you ever seen them used for any other purpose?
The Witness: Not to my knowledge, no.

Counsel for the Government propounded a series of questions directed to the witness Roedelheim bearing on the point as to whether the imported articles "could be used this way and that way," for example:

By Miss Strum:

Q. Are stampings used for various purposes?   A. Of course.

Q. Could you enumerate some of the purposes for which that stamping might ultimately be used?

Mr. Rode: I will object to the question.   It could be used for a million things.
Chief Judge Oliver: Objection sustained.

*       *       *       *       *       *       *

Q. On a lady's pocketbook?   A. Yes.

Q. On cigarette cases?

Judge Mollison: Under what circumstances have you seen it so used?   It wasn't in exactly that condition?
The witness: It was not this.   It was a heart ornament.   This piece I have never seen before.
Judge Mollison: You would have to do something to it to put it on a cigarette case?
The Witness: Absolutely.   It must be soldered on a cigarette case.
Chief Judge Oliver: If that were used as a zipper pull on a lady's bag would it be used in that half shape with the hole in the back or would two halves be soldered together to give a heart?   Which is the way you saw it used?

The Witness: I would say this thing could be used either way. In better taste, it would be double faced. I don't know whether this would be a matched set of tools and dies, on this particular object.

Q. What would you have to do to that to make a button on it? A. Solder a shank.

Q. Could you make that into a cuff link?

Mr. Rode: I object to that.

Chief Judge Oliver: Did you ever see it used as a cuff link?

The Witness: I have never seen it.

Miss Strum: That is all.

Cross Examination

By Mr. Rode:

XQ. I believe you stated that you had never seen an item such as Exhibit 1 before, is that correct? A. I believe so.

Miss Strum: I believe he said he had never seen Exhibit 1.

Mr. Rode: This is cross examination.

The Witness: I don't remember having seen this piece.

XQ. You have seen something in the design or shape of a heart used for various purposes? A. Correct.

XQ. Was the heart-shaped article that you saw used on a hand bag? How did it differ from Exhibit 1? A. Are you referring to the zipper pull that I mentioned?

XQ. Yes. A. That I remember was flat and not convex.

XQ. Was it single or double? A. It was single.

XQ. Was it as thin as Exhibit 1 or more substantial? A. It was more substantial.

Q. Did you mention any other non-jewelry use? A. I believe I mentioned cigarette cases and compacts.

XQ. Cigarette cases? A. Could be, either one of the two; any box that could be used for powder or cigarettes.

XQ. What kind of a cigarette case would have a silver heart on it? A. Are you talking now from the design?

XQ. The kind that you saw. A. I have seen them with enamel bases, and then—

XQ. You mean cigarette cases? A. Yes. The top would be enamel, and then the ornament would be adhered to it, either by adhesion or by soldering, or by squeegeeing.

XQ. That would usually be a flat part? A. It could be either flat or shaped.

XQ. Did you see many of those instances? A. That is a question I refuse to answer on the grounds I don't look for compacts with hearts.

XQ. Is it possible to squeegee a heart on a compact or cigarette case and still have it convex? A. Yes. The flat part of the compact is then raised, and it is in the dome, the center portion of this and the center portion of the dome, and the squeegeeing will not injure the case or pull it out of shape.

XQ. Would that be a woman's cigarette case or a man's cigarette case? A. In my judgment, woman's. I am not in a position to answer that completely.

XQ. You never actually handled articles exactly like Exhibit 1? A. We have handled hearts, yes.

XQ. I said like Exhibit 1. A. There is nothing exactly like this.

Mr. Rode: That is all.

The Customs Court in reaching its conclusion defined no non-jewelry use which removed the imported merchandise from the class

of unfinished jewelry but based its rejection of appellant's claim on the ground, among other reasons, that the appearance of the imported items does not indicate that they have been dedicated for use in the manufacture of brooches or earrings, and that the witness for appellant had stated "they are commercially fit for other purposes." The quoted excerpt upon which the court thus relied was lifted from its context, as hereinbefore set forth.

The trial court did not expressly find that appellant by its evidence had failed to overcome the presumption of the correctness of the collector's classification. That holding is implicit, however, in the conclusion which was drawn below.

On the record presented, we consider the position of the Government is well taken to the following effect:

In order to claim the lower rate of duty under the unfinished jewelry provision of paragraph 1527 (a), the importer would have to establish (1) that the importation had advanced beyond the stage of being a material suitable for use in the manufacture of any of the articles in paragraph 1527, (2) that it had been so far advanced by manufacture as to unmistakably indicate the particular article of jewelry which it would become when completed and (3) that it is commercially unfit in its advanced condition as imported for the making of anything else. This, the importer, in the case at bar, has failed to establish.

On that basis the judgment of the United States Customs Court is *affirmed*.

JACKSON, J. (retired), sat for COLE, J., who participated in the case below.